I was the losing attorney on the Welch case that I had to listen to everything on. And I don't get in front of the court that much, so it's kind of ironic. But may it please the court, Mr. Kanger, I am Wes Dodge, and I represent Leroy Shumaker in this case. We definitely don't have the technical issues you just heard on the prior case, but just to go over things very briefly, Mr. Shumaker was here in Omaha, Nebraska, just kind of an average blue-collar guy, lived in South Omaha, Center Street. And in May of 2015, there was a trailer that was stolen that had a gutter machine in it. Ultimately, that trailer was sitting in a lot adjacent to Mr. Shumaker's property. Police officers from Omaha came to his house, asked if they could look around and ask about the trailer and the gutter machine. He actually took them to the trailer from his house, and they looked through the gutter machine. The officers testified, at least one of the officers testified, as they pulled up, they saw a woman out in the front yard. And ultimately, I think that woman got Mr. Shumaker to the front door. There was also testimony that they saw three vehicles in the driveway at that time when they arrived. I believe it was about 3 o'clock in the afternoon. When they looked in the – after they were done looking at the trailer, ultimately the officer said to Mr. Shumaker, we want to take you downtown to do further interrogation of you. There was a woman by the name of Veronica that was at the house as well. She drove Mr. Shumaker down to the police station. The two officers that were involved in the investigation followed. Mr. Shumaker was at the police headquarters. It appears from about – well, the initial visit at the house was at 3 o'clock, and he was at police headquarters until 9 or 9.30 in the evening. Somewhere in that range, around 8.30 to 9.30 or so, it appears that the warrant was issued and that they began to do the search of the house at that time. The government's brief says that there may have been a shorter period of time, but ultimately there was a gap of some amount of time, 2 to 3 hours to a maximum of 5 or 6 hours, I believe. Mr. Shumaker testified that – well, it wasn't Mr. Shumaker. I apologize. A later officer in the case testified that when they showed up, where there used to be three cars in the front of the house, there was now just the truck that was originally Mr. Shumaker's. So one of the cars was gone, which was probably the one that Veronica and Mr. Shumaker took down to the police headquarters, but the second car was gone as well. There was also testimony that was elicited from, I believe it was Officer Branch, that he identified another woman at the house. It was possible there was two women at the house. So Mr. Shumaker is gone, and he's down at the police headquarters, and then ultimately when the warrant is issued sometime after 9 or 9.30, they go into the house and they find substantial amounts of methamphetamine in the main living area of the house. It's kind of a broad, open environment with a kitchen and then a dining area, and then there's some cabinets that I think are accessible from multiple sides of the cabinets in a central area, and it had the methamphetamine in it. So ultimately then, because of the volumes of the methamphetamine, Mr. Shumaker was charged with possession with intent to deliver. And then the third thing that ultimately happened was this case was around for about a year. It was dismissed on the speedy trial at some point and then recharged, and probably within three or four days of trial, this other individual, this witness named Troy Rickert shows up. He's arrested. He enters a plea. I don't mean he was arrested immediately before, but he entered a plea within a pretty short time period before the trial, and then ultimately he appears at trial and testifies that he's a friend of Mr. Shumaker's and that he bought methamphetamine from him, and his testimony was pretty damning as far as the inclination that Mr. Shumaker was a dealer. Did Mr. Rickert have anything to do with the gutter machine? Yes, he did, and there's just vague references to that. So I don't want to say anything that's not on the record, but I think if you or someone else would take a look at the record, I think there might have been Mr. Rickert's request to house the trailer at that location because he had a heart condition or something akin to that. And it was stolen? It was stolen, but ultimately my client was not charged with that theft or anything specifically related to that. So yes, he was tied to that as well. Did that come out in the cross-examination of Mr. Rickert, that he was involved with the stolen machine? I believe it did, Your Honor. Once again, I'm always leery of being too adamant about those things, but I believe it did. I do recollect that it was discussed in trial. And it was one of the things, now that you've gotten into Mr. Rickert, part of my argument, you know, I'm attacking three things here. One is, in essence, it's a chain of custody kind of concept. You know, this house, I think, was unattended for a period of time. It appeared there was an extra vehicle in front of it that we can't account for, and it appears there was another human being, apparently a female human being, that was there that we can't account for between the time Mr. Schumacher left the premises and sometime later when the search of the house occurred. And then we've got Mr. Rickert's testimony and my attack on his credibility, one of those being that he was, I think, a twice convicted person for dishonesty, forgery, and the like, and that he was looking at a substantial sentence on a like charge, the distribution charge, a similar distribution charge that he was going to be sentenced on in the near future. And then I'm hoping that the court would juxtapose, I hope I'm using that term correctly, that against Ms. Forbes' testimony, who's a lady that came in to testify that was a friend of Mr. Schumacher's who had no criminal record that I could find whatsoever. If she did, it was insignificant. Honestly, she pretty much testified that she had involvement with people that were involved with methamphetamine, and that was somewhat her connection and had a lot at risk. So when you look at the, I argued this to the jury, when you look at her, who had everything to lose testifying and saying that this man is a user but not a distributor. But isn't that all a jury issue? Yes, it is. I'm asking the court to look at it in its totality, Your Honor. I know I don't have a law clerk that came up with a great case or anything like that specific, but the case I did cite which says just being found in the Aponte, I believe it was, just being found in the vicinity of the methamphetamine doesn't. I thought that Mr. Schumacher admitted that 44 ounces of that was his. I don't remember the exact amount. He admitted he had a use amount. I didn't think it was 44 ounces that he said he admitted. He admitted there was three. My handwritten note to myself says that, but it was a larger quantity that I think the government argued that even that alone was more than a personal use amount. Definitely, and we don't have really the ability to argue that's not the case. I mean, our argument focuses on the fact there was other people in the House. Ms. Forbes testified that she knew one of those. There's a lady named Briley that may or may not have been the other person that the officer saw at the scene, but she was known to be distributing and would have large quantities. Ms. Forbes said she saw these large quantities in her possession at Mr. Schumacher's house and that she, in fact, was what she believed to be a distributor. Your argument is that the butler did it. I guess, Your Honor. It's somebody other than my client that did it as far as the distribution aspect of things. My argument is somewhat that it's overcharged. But, you know, that might come in in sentencing when they're totaling up the amount of drugs, but when he admits to 44 ounces or whatever, a dealer amount, I mean, that's— I'll have to look at that. Why is that not sufficient? Your Honor, I guess I need to read the transcript again because I don't recollect him admitting to the 44 ounces. I thought there was a use amount in the bathroom that was found with a minimal amount, and then there was two larger quantities that were found in two different cupboards, and I didn't think he admitted to either of those larger quantities. And they were an open view, strangely, too. They weren't like—he had a box in his bedroom that was— when you do this type of work, you see those types of boxes a lot. Let me ask Mr. Rickard or however he pronounces it. You have—your client got on the stand and testified. Correct. Before he went on the stand, did he know that he ran the risk of opening up the subject and having— Yes, he did, Your Honor. And if your client testified that the government would likely put Mr. Rickard on the stand to dispute it? Are you asking if the government knew that my client would dispute that? No, no, no. If your client knew that the government could and maybe would put on Rickard and rebuttal to testify? Yes. And generally what Mr. Rickard would say? Yes. Mr. Kanter was kind enough to call me shortly before. We didn't have a written proffer like you typically do because of the short time frames here. And so he gave me an overview of what the testimony would be. And then what's your argument about the weather, about when the sale was? You're saying that it was insufficient because he was talking about winter. And about the time I was reading this, it was in April and it was snowing outside. So it's a little hard in Nebraska. Maybe in Arkansas it doesn't snow in March and April, but that's not unusual here. That actually feeds into a little of the argument I was going to make in regard to the second argument about the potential new trial. If you look at Mr. Schumacher's testimony, he didn't know necessarily what would come up later at this appellate level anyway. You know, those types of arguments. Actually, he discussed that with me after he was convicted and I met with him in the jail. He said, I don't think I lived in that house in the winter months when he testified I was. He does testify I saw him at a barbecue and he was at my house during summer months. And then I said, well, you know, we've got to find something that says that. I mean, you were in the house, you were renting it, utility bills, et cetera. So I subpoenaed the utility bills and was able to see that he had a utility bill, I think, that he started acquiring in late February of 2016, you know, which would be late in the winter months. And your argument still, I told him I wished it would have been April or May. I'm not arguing with you, I'm just telling you. No, no, and I agree with you 100%. I think that's pretty common. Yeah, I'm a lifelong Nebraskan, so I understand that in depth. But I guess I was impressed with the fact that he made those statements not knowing where this argument could go. We did find the utility bills that are later in February. And then I called the landlord and the landlord did agree. I was surprised he was so agreeable, but he did the affidavit that we submitted. And I think the landlord said, and again I'm talking off the top of my head here a little bit, but, you know, you have to get the house's utilities in so they don't freeze in February or whatever. But he said I think he moved in in April. So we do have a valid argument there. And then when Judge Smithkamp, and I think Judge Smithkamp is a wonderful judge. I've enjoyed working in front of her. But in her sentencing, Mr. Kanger quotes her statement in there. And she says she was impressed with Rickard's analysis and knowledge of the house at the time and the makeup of the house. And she draws that from the fact that he would have been there in the winter. But she, at that point the transcript wasn't prepared. So she didn't have the ability to look at the transcript. And if you look at the transcript, there is the discussion that he was at the house at least two other times. He acknowledges he's a friend of Mr. Schumacher's or was. And honestly, it was a connection through methamphetamine, I'm sure, in that regard. And they had a common acquaintance. I can't remember the lady's name, but it was a lady that knew the two of them. And they had all been in the house together. So there's evidence that he was in the house and would have a knowledge of the house, which I think contradicts that. So I'd like to save a little time for rebuttal unless the court has other questions. Okay. Ms. Rudolph, you can stop the clock, but there's a pending motion by your client for withdrawal. And we just, I think it was an admin panel, said we'd take it with the case. Is there anything newly developed on that or anything? No, I don't. Honestly, I haven't had a direct communication other than seeing that. You know, it's the type of thing we see when you do the CJA work. And I don't know for sure, Your Honor. Okay. Thank you. Good morning, Mr. Ganker. May it please the Court. Good morning, Your Honors. Counsel. You may proceed. Thank you. When one reviews all the evidence in this case, I believe there's only one conclusion you can come to, and that if you view the evidence in the light most favorable to the government, any reasonable jury can convict the defendant beyond a reasonable doubt. I submit to this Court that the weight alone found in this residence is evidence of possession with intent to distribute. Maybe my note's wrong, but I thought he admitted to a quantity that could be argued was enough for a dealer. He admitted to a teener amount, 1.6 grams. That was found in his master bedroom. That was all? Yes. Okay. The two other larger quantities, an ounce and a half ounce that was found in the kitchen, he said his supplier left that behind. But the agent did testify that a teener is an amount one can redistribute, and he's encountered many people before that, to support their habit, they'll oftentimes buy a teener and sell half of that. And the evidence corroborates the, well, the evidence was indicative of drug dealing just from the evidence found in the bedroom. There was multiple unused small Ziploc baggies that the officer testified were commonly used to distribute methamphetamine. The defendant told the jury that he possessed those baggies, along with the 1.6 grams, and that he used those baggies to ration out his daily use. Officers found no evidence of rationing of use because all of these baggies were unused. There was no baggies lying around with residue in them. The jury obviously rejected his statement and found him guilty. In regards to the quantities found in the kitchen, there was an ounce found in the kitchen cabinet. Along with that ounce, there was approximately $1,200, drug records, as well as a black digital scale. Across the kitchen in the kitchen drawer, there was another amount of about a half ounce, 16 grams, and that was found along with drug ledgers as well. The officer testified that all those items obviously were indicative of drug dealing. There was also paraphernalia found in the house that showed that he was using as well. In regards to the defendant's claim that there were other parties in there, in the residence, there is absolutely no evidence that would support the defense statement. The officers testified that when they left the residence, they secured it. They had one officer they left behind, and Officer Fox testified in the transcript at page 32 of what procedures are followed. Those procedures consist of leaving at least two cruisers there so they can make sure that no one enters or exits the residence. When Officer Haley arrived back at the scene, he followed the officers and Mr. Schumacher down to Central for the interview, and he turned around and went back shortly thereafter to secure the residence, to make sure it was secure. While they were obtaining the warrant, he said officers were already at the scene and they had the place secured. That testimony occurs at page 121 of the transcript. Furthermore, when Branch was searching the residence, he testified that the front door was locked. In order not to break it, they entered through a window. There was no one else inside, and the only other exit was a basement door, which he said was locked from the inside. It was barred and barricaded. The officers found no other venue items in the home, no evidence of woman's clothing, woman's toiletries. All the evidence pointed to the defendant, Mr. Schumacher. A review of that evidence, again, supports the jury's verdict. And then in regards to the claim of the newly discovered evidence, I submit that that newly discovered evidence simply wasn't material. At best, it brought into question when Mr. Schumacher moved into his residence. Was it February when he started paying the bills, or was it sometime thereafter when the landlord, who didn't appear in court, submitted an affidavit that said he believed the defendant may have moved in in April? And again, the timing is material as to Mr. Rickard's statement of where the defendant kept his drugs. He testified about the exact cabinet, how it separated the kitchen from the living room, how it had drawers, and there was multiple levels on it. He testified that on three occasions. When he went to Mr. Schumacher's residence, Mr. Schumacher, on each occasion, took his methamphetamine out of the cabinet area. The first time he was over there, he purchased an ounce. He testified he wanted a pound. He came back about a week later. Mr. Schumacher sold him a half pound, again, retrieving it from the center cabinet area. And I remember Mr. Rickard saying he still wanted his pound, so he went back a third time. On the third occasion, Mr. Schumacher, in fact, distributed a pound of methamphetamine to him. Now, did you provide that information to counsel before Mr. Rickard testified? As soon as it came to my attention, I did, yes. The officers knew who Mr. Schumacher was dealing with. They had other information that wasn't submitted at trial. They did a later search warrant on the house that I did not bring up, but Mr. Schumacher brought it up. I didn't get into the details of what information they had because one of the gals that Mr. Rickard was dating was a Sonia Smithberg. Officers had spoken to her before. They knew she was getting drugs from Schumacher, and she was supplying them back and forth. Based on their knowledge, we went and found Mr. Rickard, who was in jail. He wasn't, at the time, didn't want to cooperate. We informed him that we had a trial coming up with Mr. Schumacher, and would you like to give us your knowledge about it? The first time was about four days before trial. He described the inside of this residence. No one showed him any pictures. He described the outside of Mr. Schumacher's residence. He described his involvement with his girlfriend. He even talked about this trailer. It was his trailer that someone stole from him. I don't know how much of this came out on evidence, but he was in the hospital on May 7th when they did the search warrant. Somebody, I think it was his girlfriend, a drug dealer, a drug user, stole his trailer, and then someone else stole the gutter machine and put it inside of his trailer and parked it at Schumacher's house. From all the evidence we have, the trailer belonged to Rickard, but the gutter machine he knew nothing about because somebody put it in his trailer and then stole his trailer and parked it at Mr. Schumacher's. I don't know that Mr. Schumacher knew whether any of that property was stolen. I submit it's not relevant to the charge at hand. Again, a review of all the evidence I submit to this court would certainly conclude that a reasonable jury could find more than sufficient evidence that he was guilty beyond a reasonable doubt. And then lastly, the new discovered evidence, as Judge Smithkamp said at sentencing, she simply didn't see that it was pivotal. I submit it wasn't material. It didn't change the fact that Rickard knew where Mr. Schumacher kept his drugs, the detail that he gave about the area, how he described it without ever seeing pictures. And even if we weren't to call Mr. Rickard, he'd still have sufficient evidence of just the items found in his residence, his unbelievable explanation, which the jury obviously rejected. I submit to you he had more than enough evidence, and any newly discovered evidence simply just wasn't material. With that, if there's no more questions. Okay. Thank you. Mr. Roth, you have a little over a minute. Thank you, Judge. First of all, I want to thank Mr. Kanger for his honesty in regard to clarifying that it was a teen or a very small amount, as far as that's concerned. Addressing some of the things that he had mentioned, he said the officer said the door was barred and barricaded in the basement. I think there's a law that doors have to open out, so that doesn't make much sense that that would be the case. And then there was the statement he made about the landlord's information wouldn't necessarily have been pivotal for the jury. The jury was out a long time. They got the case late the night before, and they spent an entire day deliberating on it. As you look at this, you're somewhat saying, hey, a lot of drug volume, a lot of information here. They spent an entire day trying to reach a resolution. So I guess I think there must have been something going on in that jury room, and I think the landlord's information that I'm pretty sure he moved in in April that's contradictory to what Rickard said could have tipped it the other way. So I know I've got 10 seconds here. You are the last check, and I would like the court to go over the record if they could. I didn't get a chance to address the actual records, the, quote, drug records, and look at how deficient they appear to be in the arguments that were made there, the credibility of Mr. Rickard's testimony, and the security of the area and whether or not people could have come and gone at the time and who were these other people. And then if that's the case, I would like the court to remand it for a new trial. Okay. Thank you very much. And thank you. I appreciate it. Thank you both for your arguments, and well done. We will take it as advisement and be back to you in due course. This is the last time I sit as a judge, so it's been a real honor and a privilege to do that. And I see in the back of the courtroom some of my former law clerks as well as my current clerks and Judge Shepherds and Judge Beams, and I appreciate you all being here. So thank you very much. As we heard in the first case, the key is having good law clerks that find the needle in the haystack. So this is my last. So that's right. Could I have a moment? Well, on my behalf, and I suspect my colleague from Arkansas's behalf, but he can speak for himself, it's been an honor to serve with Judge Riley. He was my replacement when I took senior status in this court, and you know you're getting old when your successor is going to walk off into the sunset a few days before you do, perhaps. But he's not only been an excellent judge, he was the chief judge of this circuit and served on committees of the federal judiciary, the advisory committee, directly a small group with the Chief Justice of the United States, and in between meetings, I think a couple of times a year, they administered the federal courts in the United States, and they went through a period of retrenchment, of lowering of money, and all sorts of things that have a bearing on how well the court can function. And on behalf of myself, at least, and I think on behalf of all the judges of the court now and in the past, I want the record to show that he gets an A-plus rating. Thank you, Judge Bean. Well, let me just add that, first of all, I'm honored to participate in our court session this morning. That is such a historically significant occasion as it marks our colleague Judge Riley's last arguments as a judge of this court. I will say that it's my understanding that Judge Riley has not and will not technically retire, fully retire. So there is precedent for judges who take senior inactive status to return, and so I'm holding out hope that that will be the case with Judge Riley. But Judge Riley has been a friend, a colleague. He's one of the judges that welcomed me to the court and was my chief judge for the bulk of my years, 11 years on the Court of Appeals, and led our court with distinction, with humor, and I can say that, Judge, any time that I perhaps made the mistake of thinking too highly of myself, I could count on Judge Riley to eliminate those thoughts, and of course I've tried to do the same with him. So thank you for your service and for your friendship. I want to say one additional thing. I want to also add that Judge Riley hasn't done this by himself. He has had a wonderful colleague, his wife Norma, and he puts on a good dinner at his house with some frequency, and that's Norma and his judicial assistants' help. But he has had that help, and we want to recognize her. And one additional thing. He started on this job a few months after some miscreants flew two airplanes into a building in New York City, and if you think that didn't throw the federal judiciary into a bit of a quandary in terms of travel and all sorts of things, and so it was under a bit of duress that he was there, and he held up and held us all together. We all worked together in that ambience. So again, thanks a lot. Thank you. I don't want to thank you both for kind words. What I'm going to miss are the people, and it's very hard to do that. But I should recognize my judicial assistant or secretary from my law practice, Chris Nice, who's back there, and she and I have been together now for over 30 years. And everybody on the court knows when things happen correctly, particularly when I was chief judge, it was because of what Chris did, not what I did. And I got the credit, but she did all the work. And then backed up by the law clerks for 16, 17 years. So thank you all, the law clerks, Chris, and the judges that have been great colleagues and very dear friends. So thank you. With all that rambling. May I be recognized, Your Honor? Yes, you may. Judge Rossiter. I'm not the only one who can get away with this, hopefully, in this setting, but I know we're not supposed to applaud or sing unless we're in a ceremonial session, but if you would. Thank you. Well, on that kind note, I appreciate it. I do, and it's hard to walk through this door. Thank you.